**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROBERT R. MILBURN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 13-1418** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION</u>**

ARTHUR J. SCHWAB, District Judge

**I. Introduction**

Plaintiff, Robert R. Milburn ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act (the "Act"), seeking judicial review of the final decision of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for supplemental security income ("SSI"). The parties have submitted Cross–Motions for Summary Judgment on the record developed at the administrative proceedings. For the following reasons, Plaintiff's Motion for Summary Judgment (ECF No. 13) will be GRANTED in part insofar as it seeks a vacatur of the decision of the Commissioner of Social Security and a remand for further administrative proceedings consistent with this Opinion, and DENIED in part to the extent that it requests an award of benefits. The Commissioner's Motion for Summary Judgment (ECF No. 15) will be DENIED, and the administrative decision of the Commissioner will be VACATED and remanded for further proceedings consistent with this Memorandum Opinion.

## II. Procedural History

On or around July 12, 2010, Plaintiff filed an application for SSI, alleging disability beginning January 20, 2009 due to bipolar disorder. (R. 139-45, 168-75.)[1] The claim was initially denied on September 15, 2010. (R. at 72-76.) On October 20, 2010, Plaintiff filed a written request for hearing pursuant to 20 C.F.R. § 416.1429, *et. seq.* (R. at 79-81.) An administrative hearing was held on November 21, 2011, in Johnstown, Pennsylvania, before Administrative Law Judge ("ALJ") Charles Pankow. (R. at 32-69.) Plaintiff, who was represented by counsel, appeared and testified. (R. at 36-56.) Irene Montgomery, an impartial vocational expert ("VE"), also testified. (R. at 56-60.) In a decision dated February 14, 2012, the ALJ determined that Plaintiff was not disabled within the meaning of the Act. (R. at 16-31.) The Appeals Council denied Plaintiff's request for review on August 1, 2013 (R. at 1-6), thereby rendering the ALJ's decision the final decision of the Commissioner in this case.

Plaintiff commenced the present action on September 30, 2013 seeking judicial review of the Commissioner's decision. (ECF No. 1.) Plaintiff filed a Motion for Summary Judgment on March 6, 2014. (ECF No. 13.) Defendant filed a Motion for Summary Judgment on April 4, 2014. (ECF No. 15.) These motions are the subject of this Memorandum Opinion.

## III. Statement of the Case

### A. The ALJ's decision

In his decision denying SSI to Plaintiff, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since July 12, 2010, the application date (20 C.F.R. § 416.971 *et seq.*). (R. at 21.)

---

[1] References to the administrative record (ECF No. 9), will be designated by the citation "(R. at __)".

2.  The claimant has the following severe impairments:  chronic pain syndrome, mild
    acromioclavicular joint hypertrophy, mild degenerative joint disease of the hip,
    depression, a major depressive disorder, anxiety, and a generalized anxiety
    disorder  (20 C.F.R. § 416.920(c)).  (R. at 21.)

3.  The claimant does not have an impairment or combination of impairments that
    meets or medically equals the severity of one of the listed impairments in 20 CFR
    Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).
    (R. at 22.)

4.  The claimant has the residual functional capacity to perform light work as defined
    in 20 C.F.R. § 416.967(b) except he cannot reach above shoulder level with the
    dominant right upper extremity; and he must avoid exposure to vibration.
    Further, the claimant is limited to unskilled work, requires a low stress
    environment defined as few changes in work settings, no fast-paced or quota-
    production standards; and he can have only occasional contact with the public, co-
    workers, and superiors.  (R. at 24.)

5.  The claimant was unable to perform any past relevant work (20 C.F.R. §416.965).
    (R. at 26.)

6.  The claimant was born on January 23, 1961, and was 49 years old, which is
    defined as a younger individual age 18-49, on the date the application was filed
    (20 C.F.R. § 416.963).  (R. at 26.)

7.  The claimant has at least a high school education and is able to communicate in
    English (20 C.F.R. § 416.968).  (R. at 26.)

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2). (R. at 26.)

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 416.969 and 416.969(a)). (R. at 26.)

10. The claimant has not been under a disability, as defined in the Social Security Act, since July 12, 2010, the date the application was filed (20 C.F.R. §416.920(g)). (R. at 27.)

**B.  Background Facts and Medical evidence**

Plaintiff is a former journeyman plasterer with an eighth grade education and a GED equivalency. (R. 37, 234.) In the early 1990s, he suffered injury to his hip and shoulder when some scaffolding collapsed on him. (R. 44, 213.) He did not have insurance, so he did not receive any treatment for his injuries and instead took ibuprofen and aspirin. (Id.) He claims that he stopped working after being hospitalized with pneumonia in 2005 because he could not get full-time work due to his injuries. (R. 37-38, 234.)

The evidence of record shows that Plaintiff began treating with Robert L. Brodsky, M.D., a family medicine physician, on July 30, 2009. (R. 213.) As of that date, Plaintiff presented with complaints of chest pain and shortness of breath and a history of right shoulder and hip pain stemming from his work-related injury some fifteen years prior. Because he had been taking

ibuprofen chronically, Plaintiff was concerned about abdominal fluid retention and possible liver damage.  He could not raise his arm above 90 degrees and complained of stiffness and cracking of his right hip and well as chronically painful movement.  (Id.)  Upon examination, Plaintiff was alert, comfortable, and in no apparent distress, but he did show signs of pain in his right hip when changing positions transiently and limited range of motion in his right shoulder.  (R. 214-15.)  Dr. Brodsky assessed:  (1) elevated blood pressure, (2) chronic shoulder and hip pain, (3) abdominal discomfort, not clearly from ascites as Plaintiff had suspected, and (4) chest pain and shortness of breath.  (R. 215.)  Plaintiff underwent an EKG which showed no acute changes or arrhythmias.  He was taken off ibuprofen and started on tramadol as needed for pain.  (R. 215.)  Blood test results were normal except for Plaintiff's very high lipid levels.  (R. 218.)  As a result, Dr. Brodsky planned to discuss cholesterol lowering medication with Plaintiff in order to reduce his risk of heart disease.  (R. 218.)

    In September 2009, Plaintiff returned for a follow-up visit with Dr. Brodsky.  (R. 207.)  At that time, Plaintiff reported that the tramadol helped but did not completely control his pain.  Plaintiff was not following any particular diet and was consuming a lot of red meat.  Dr. Brodsky assessed hyperlipidemia with very high risk levels, elevated blood pressure, and tobacco use.  He started Plaintiff on simvastatin to address his hyperlipidemia and counseled Plaintiff on regulating his blood pressure and preventing cardiovascular disease by improving his diet, losing weight, and ceasing tobacco use.  (R. 208.)  Dr. Brodsky noted that Plaintiff was going to begin monitoring his blood pressure and that he might need to consider medication based on subsequent readings.  (Id.)

    The following month, Plaintiff underwent x-rays of his right shoulder and hip.  Images revealed mild AC joint hypertrophy of the right shoulder with no fracture or erosion of the bone.

A healing fracture at the right sixth rib was suspected but the glenohumeral joint was preserved. (R. 292.)  Images of Plaintiff's right hip showed mild degenerative joint disease but no fracture or bone erosion.  It was noted that the prominent bone at the femoral head-neck junction could be related to cam impingement and that orthopedic evaluation should be considered if clinically warranted.  (Id.)

Plaintiff saw Dr. Brodsky again in April and October of 2010.  (R. 201, 263.)   In April, Dr. Brodsky noted that Plaintiff was taking more tramadol and was running short every month.  (R. 201.)  Plaintiff reportedly experienced dizziness and lightheadedness after not having tramadol for a couple of days.  He was still taking his simvastatin without side-effects.  (Id.)  Plaintiff also complained of chronic heartburn, for which Dr. Brodsky prescribed ranitidine and recommended that Plaintiff eliminate coffee and elevate the head of his bed.  (R. 201, 204-05.)  A review of systems revealed no angina, edema, or leg pain, no frequent constipation or diarrhea, no changes in voiding, and no headaches, focal weakness, or loss of vision.  (R. 202.)  Objectively, Dr. Brodsky found Plaintiff to be alert, comfortable, and in no apparent distress.  Although his blood pressure and lipid readings had improved, Plaintiff's High Density Lipoprotein (HDL) remained low and his triglyceride level remained elevated.  (R. 203-04.)   Dr. Brodsky and Plaintiff discussed increasing exercise, reducing carbohydrates, and losing weight as a means to help Plaintiff reduce his triglycerides and increase his HDL.  (R. 204.)  Dr. Brodsky's diagnosis was elevated blood pressure without hypertension, tobacco use, mixed hyperlipidemia, and depression.  (R. 204.)

In October 2010, Plaintiff reported that his diet was stable and his reflux symptoms were relieved with antacids.  (R. 263.)  His exercise was limited by hip pain but he was able to walk the dog and perform yard work.  (Id.)  He was trying to wean down his smoking.  (R. 264.)  A

review of systems revealed no chest pain, shortness of breath, edema or abdominal pain. (Id.) Plaintiff's heart rate and rhythm were regular and he appeared to be alert, comfortable, and in no apparent distress. (R. 265.) Following his examination, Dr. Brodsky completed a functional capacity questionnaire in which he diagnosed chronic hip and shoulder pain, depression, and anxiety and assigned Plaintiff a fair prognosis. (R. 254.) In response to the questionnaire, Dr. Brodsky indicated that Plaintiff could sit for up to two hours and stand or walk for up to two hours in an 8-hour workday. In addition, Dr. Brodsky opined that Plaintiff could only occasionally lift and carry 0 to 20 pounds of weights, occasionally engage in fingering activities, and rarely perform grasping or handling. (Id.) Finally, Dr. Brodsky opined that Plaintiff's pain would frequently interfere with his ability to attend to, and concentrate on, even simple work tasks, and Plaintiff's impairments and/or treatments would cause him to miss more than four days of work each month. (Id.)

The medical records also show that Plaintiff sought treatment from Joel Last, M.D., for his psychiatric symptoms. Plaintiff underwent an initial psychiatric evaluation by Dr. Last on August 13, 2009. (R. 234.) Dr. Last's notes reflect that Plaintiff has a long history of depression and had been hospitalized in 1993 for suicidal ideation but left after three days without any treatment. Plaintiff reported seeking psychiatric treatment a few months prior to his visit with Dr. Last because he felt that he was not getting anywhere and wanted some help. Dr. Last conducted a mental status examination and found Plaintiff to be somewhat disheveled and unkempt with poor hygiene. However, Plaintiff's speech was clear, soft-spoken and articulate. (Id.) Although the second page of Dr. Last's mental status examination is missing from the record, handwritten notes indicate that Dr. Last diagnosed major depression and prescribed Wellbutrin. He also prescribed Restoril to address Plaintiff's sleep disturbances. (Id.)

At his next visit two months later, Plaintiff reported feeling jumpy and irritable, but he did not evidence suicidality or psychosis. Dr. Last diagnosed generalized anxiety disorder in addition to major depression and prescribed Ativan. (R. 233.)

In July 2010, Dr. Last completed a medical source statement in which he opined that, due to poor concentration, Plaintiff would experience slight restrictions in his ability to understand, remember, and carry out detailed instructions and make judgments with respect to simple work-related decisions. (R. 231.) Dr. Last further opined that, due to poor coping skills and a low frustration tolerance, Plaintiff would experience slight restrictions with respect to his ability to interact appropriately with supervisors, co-workers, and members of the public, respond appropriately to work pressures, and respond appropriately to changes in a routine work setting. (Id.) Dr. Last felt that Plaintiff could manage benefits in his own best interest. (R. 232.)

The following month, Dr. Last reported that Plaintiff had been off his medications since June and had reportedly been unable to muster the nerve to come in for an office visit. (R. 230.) He was living with a friend but tended to isolate himself. Dr. Last made no change in his previous diagnosis and restarted Plaintiff on Wellbutrin, Ativan, and Restoril. (Id.)

On December 16, 2010, Dr. Last reported that Plaintiff was off of his Wellbutrin due to headaches. (R. 283.) He was very depressed and had no motivation but was not suicidal or psychotic. Dr. Last prescribed Zoloft in lieu of the Wellbutrin and advised Plaintiff to follow-up the following month. (Id.) That same date, Dr. Last completed a functional capacity questionnaire addressing Plaintiff's mental capabilities. (R. 255.) Dr. Last opined that Plaintiff's chronic pain from his shoulder and hip injury worsened his depressive symptoms, which included a pervasive loss of interest in almost all activities, emotional withdrawal or isolation, difficulty thinking or concentrating, thoughts of suicide, and mood disturbances. Dr.

Last's Global Assessment of Functioning ("GAF") for Plaintiff was 45. He assessed moderate functional limitations in terms of Plaintiff's activities of daily living, social functioning, and concentration, persistence, or pace. In addition, Dr. Last estimated that Plaintiff's impairments or treatment would cause him to be absent from work more than four days each month. (Id.)

Treatment notes from January of 2011 reflect that Plaintiff was experiencing bad dreams, persistent depression, and passive suicidal ideation. (R. 284.) Plaintiff also reported that Zoloft was providing no relief and was upsetting his stomach. Dr. Last increased Plaintiff's dosage of Restoril to help him sleep and switched him from Zoloft to Prozac. (Id.) The following July, Plaintiff reported that the Prozac caused him GI upset. (R. 285.) Plaintiff was not exhibiting psychosis but was positive for suicidality. Dr. Last's diagnosis of major depression and generalized anxiety disorder remained unchanged, but he switched Plaintiff from Prozac to Tofranil. (Id.) In October of 2011, Plaintiff was still very depressed and was experiencing passive suicidal ideation, but he was able to contract for safety. (R. 291.) He could not tolerate Tofranil, so Dr. Last planned to start Plaintiff on Cymbalta. (Id.)

Included in the record are Dr. Lasts' answers to medical interrogatories, which he provided on August 16, 2011. (R. 278-79.) In those answers, Dr. Last opined that, as a result of his condition, Plaintiff could reasonably be expected to experience cognitive difficulty and trouble with memory due to his poor focus and concentration. (R. 278.) Dr. Last further opined that Plaintiff has serious limitations with respect to understanding, remembering and carrying out simple instructions, making simple work related decisions, responding and interacting appropriately to supervisors and coworkers, and dealing with changes in a routine work setting. Because of his low frustration tolerance, Dr. Last felt that Plaintiff could not successfully complete five consecutive work days in a week. (R. 279.)

In addition to receiving psychiatric treatment from Dr. Last, Plaintiff attended approximately eight outpatient psychotherapy sessions beginning in December 2009. (R. 277.) During these sessions, Plaintiff openly discussed his concerns and was active in his treatment planning. He readily accepted interventions and suggestions. He was also described as cooperative and engaged in his therapeutic process. (Id.)

## C. Hearing testimony

At the administrative hearing, Plaintiff testified that he currently lives in a mobile home with a friend with whom he shares the responsibilities for cooking, house work, grocery shopping, and yard work. (R. 39.) Plaintiff does his own laundry. (Id.) His hobbies include surfing the internet and watching movies. (Id.) He is able to perform some minor repairs on computers. (R. 40, 52-53.) He reads the newspaper and "TV Guide" and listens to audiobooks. (Id.) He manages his own personal hygiene with some difficulty. (R. 43.) He cannot comfortably reach down to tie his shoes. (R. 53.) He is capable of managing bills, but his roommate pays the bills because everything is in his name. (R. 52.)

Plaintiff further testified that he can sit for about 45 minutes before his hip begins to bother him. (R. 41.) He can stand for about 45 minutes and walk about one block before his pain gets too intense. (Id.) He can lift with his left arm but cannot hold onto objects with his right, dominant arm. (R. 41-42.) He needs to use both hands in order to lift a full gallon of milk. (R. 47.) When stirring a pot of soup with his right arm, he feels like someone is driving a wedge into his bone. (R. 46.) Changes in the weather or humidity or exposure to vibration tend to make his pain worse. (R. 48.) Shoulder and hip pain also disrupt Plaintiff's sleep at night, so he has to sleep on his side and try to prop up his arm. (R. 46, 50.) At the administrative hearing, Plaintiff was observed to be leaning on a table in order to relieve the pressure on his right hip.

(R. 49.)  He stated that the Cymbalta provides some relief from his pain but also causes dizziness, nausea, blurred vision, and drowsiness.  (R. 43.)

Plaintiff testified that he is unable to work due to the fact that he cannot lift anything and cannot concentrate most of the time.  (R. 43.)  He often loses interest while watching a movie and does not make it through the whole film.  (R. 52.)  He has problems both with anxiety and with his temper and is usually agitated.  (R. 43.)  He is nervous being around a lot of people or people that he does not know well.  (R. 51.)  When grocery shopping, he tries to go first thing in the morning to avoid crowds, or he shops with his friend.  (Id.)  He feels constantly depressed and states that he cannot "find a good excuse to keep on going."  (R. 55.)

At the hearing, the vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was able to perform light, unskilled work but could not reach above shoulder height with the dominant right upper extremity, could not be exposed to vibrations, would require a low-stress environment (defined as few changes in the work setting and no fast pace with quota productions standards), and could only occasionally have contact with the public, coworkers, and supervisors.  (R. 56-57.)  The VE testified to a significant number of jobs in the national economy that such an individual could perform, such as weigher/scales operator, small parts assembler, or inspector.  (R. 57.)  On cross-examination, the VE stated that these jobs permit a sit/stand option but require the use of both hands in bimanual coordination with arms at table-height level.  (R. 59.)  The VE further testified that full-time competitive employment would be precluded if the hypothetical individual missed 1 to 2 days of work monthly or if the individual consistently failed to stay on task ten percent of the time.  (R. 58.)  Similarly, the enumerated jobs would be precluded if the hypothetical individual

were off task for two hours per day, in addition to the customary unscheduled breaks, due to pain and psychiatric symptoms.  (R. 58, 59-60.)

## IV. Standard of Review

This Court's review is limited to determining whether the Commissioner's decision is "supported by substantial evidence."  42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).  The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record.  *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986).  Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (internal quotation marks omitted).  As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently."  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  "Overall, the substantial evidence standard is a deferential standard of review."  *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period."  *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental

impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2) (A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions, he or she must make specific findings of fact. *Stewart v. Sec'y of Health, Educ. & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rule making authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court has summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n.7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision.

**V. Discussion**

Plaintiff asserts that the ALJ committed numerous errors requiring either reversal or remand of his decision. In particular, Plaintiff argues that the ALJ erred in rejecting the opinions of his treating medical sources, failed to address a direct medical opinion from his treating psychiatrist, failed to address and analyze a documented limitation with respect to his hands, failed to incorporate all relevant impairments and limitations into his hypothetical question to the vocational expert, and failed to comply with the provisions of the Administration's Hearings, Appeals, and Litigation Manual by virtue of his reference to a psychiatric treatise. Defendant

counters that the ALJ properly supported his decision with substantial evidence from the record and, therefore, his opinion should be affirmed. This Court agrees with Plaintiff, in part.

A.

The Court will first address Plaintiff's argument that the ALJ erred in rejecting the opinions of his treating psychiatrist, Dr. Last, and his treating physician, Dr. Brodsky. "A cardinal principle guiding disability determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a long period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (*quoting Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)) (citations omitted); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir. 1994). In fact, a treating source's opinion concerning the nature and severity of the claimant's alleged impairments will be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001); 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). A physician's opinion is not binding upon an ALJ with respect to the issue of a claimant's functional capacity. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2012). However, an ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir.1999) (*citing Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir.1985)). Moreover, when an ALJ chooses to reject the opinion of a treating physician, he must adequately explain his reason for doing so. *See Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence."). "In the absence of

such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

1.  The Opinions of Dr. Brodsky

The record reveals that Dr. Brodsky's treatment is detailed in five exhibits (*i.e.*, Exhibits 2F, 7F, 9F, 15F, and 16F), which include Dr. Brodsky's residual functional capacity (RFC) evaluation rendered on October 21, 2010. (Ex. 7F, R. 254.) In his RFC evaluation, Dr. Brodsky assessed the following work-related limitations: (i) Plaintiff could sit 0-2 hours in an 8-hour work day; (ii) he could stand/walk 0-2 hours in an 8-hour workday; (iii) he could "occasionally" lift 20 pounds or less; (iv) he could "occasionally" perform fingering movements; (v) he could only "rarely" perform grasping, handling, stooping, or crouching; (vi) he would "frequently" experience interference with attention and concentration due to pain; and (vii) he would be absent from work more than four days each month as a result of his impairments or treatment. (R. 254.)

Plaintiff argues that the ALJ erred by addressing only three of the five exhibits from Dr. Brodsky and by addressing only one of the seven findings in Dr. Brodsky's functional capacity assessment. Plaintiff further argues that the ALJ's explanation for discounting Dr. Brodsky's opinions was inadequate.

Our review of the ALJ's opinion reveals that the administrative law judge explicitly acknowledged and discussed Exhibits 2F, 9F, and 15F in connection with his analysis of the medical evidence. (S*ee* R. 21, 24.) The Court finds no error with respect to the ALJ's treatment of these medical records.

With regard to Exhibit 16F, the ALJ did not explicitly analyze the content of this document, but he clearly acknowledged that it comprised part of the relevant medical records.

(*See* R. 22 (referring to the medical evidence and citing "Exhibits 1F-16F").)  Based on the

circumstances of this case, the ALJ's failure to discuss Exhibit 16F in more detail does not

constitute reversible error.  The Third Circuit Court of Appeals has held that the ALJ need not

make reference to every relevant treatment note in the record, and the ALJ is certainly not

expected to discuss non-probative evidence.  *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d

Cir.2001); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203–04 (3d Cir.2008).  Where a

medical finding does not provide support for the existence of an additional impairment or

functional limitation, there is no need for an ALJ to discuss that evidence.  *Hur v. Barnhart*, 94

Fed. App'x 130, 133 (3d Cir. 2004); *Phillips v. Barnhart*, 91 Fed. App'x 775, 780 (3d Cir. 2004).

Notably, Exhibit 16F outlines Dr. Brodsky's "After Visit Summary" of Plaintiff's examination

on September 8, 2011.  (R. 293-95.)  The summary does not add anything new in terms of

impairments or functional limitations, nor does it contain significant medical findings.  In fact,

the summary essentially contains nothing more than a review of Plaintiff's diagnoses and

medications.  Consequently, the ALJ's failure to address this particular record in more detail does

not constitute grounds for a remand.

On the other hand, the Court agrees with Plaintiff that the ALJ failed to adequately

account for Dr. Brodsky's opinions as set forth in Exhibit 7F, his October 21, 2010 functional

capacity assessment (referred to by the ALJ as a "Medical Source Statement").  The entirety of

the ALJ's discussion of this exhibit is as follows:

> As for the opinion of Dr. Brodsky, he completed a Medical Source Statement that
> indicated the claimant would miss more than four days per month due to his
> impairments.  However, Dr. Brodsky's report is inconsistent with other treating
> and examining sources of the claimant's condition as well as his activities of daily
> living.  Therefore, this opinion has been given little weight in determining the
> claimant's residual functional capacity.

(R. 26.)  Although the ALJ expressly discredited Dr. Brodsky's conclusion that Plaintiff would miss more than four days of work each month as a result of his impairments or treatment, the ALJ failed to acknowledge or discuss other potentially relevant functional limitations which Dr. Brodsky assessed – namely, Plaintiff's inability to sit or stand and walk for more than two hours each in an 8-hour work day, Plaintiff's ability to lift and carry 0 to 10 pounds only occasionally, and Plaintiff's limitations with respect to fingering movements, grasping, and handling.  (R. 254.)  Each of these limitations is either patently or potentially inconsistent with the ALJ's determination at step four that Plaintiff retains the functional capacity to engage in a limited range of light work.[2]  Accordingly, Dr. Brodsky's opinions constitute relevant medical evidence and, to the extent the ALJ implicitly rejected these findings, he was required to explain why.  *See Adorno v. Shalala,* 40 F.3d 43, 48 (3d Cir. 1994) ("The Secretary must provide some explanation for a rejection of probative evidence which would suggest a contrary disposition.") (*citing Brewster v. Heckler,* 786 F.2d 581, 585 (3d Cir. 1986)).  Although the ALJ stated that "Dr. Brodsky's report is inconsistent with other treating and examining sources of the claimant's condition" (R. 26), it is not clear from the record what the ALJ was referring to.  The record does not contain reports from any other medical source who treated or examined Plaintiff relative to his physical impairments.  Although the record does contain reports from Joel Last, M.D., Plaintiff's treating psychiatrist, Dr. Last's reports do not address Plaintiff's physical impairments and, therefore, they cannot be viewed as being inconsistent with this aspect of Dr. Brodsky's functional capacity assessment.[3]

---

[2] Light work is defined as work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 416.967(b).

[3] The Court notes that, in August 2010, a state agency psychologist performed a mental RFC assessment and a psychiatric review technique based on his review of the administrative record.  (R. 237-53.)  The psychologist,

In addition, the ALJ failed to adequately explain his reasons for discounting Dr. Brodsky's opinion that Plaintiff would miss more than four workdays per month as a result of his impairments or treatment. It is not clear from the record how this aspect of Dr. Brodsky's opinion was inconsistent with the findings of "other treating and examining sources," particularly since Dr. Last's medical opinions were in line with those of Dr. Brodsky. Notably, in his December 16, 2010 responses to the mental functional capacity questionnaire, Dr. Last (like Dr. Brodsky) estimated that Plaintiff would miss more than four workdays per month as a result of his impairments or treatment. (R. 255.) In his August 16, 2011 answers to medical interrogatories, Dr. Last opined that Plaintiff would be unable to complete a five-day workweek. (R. 279.)

While the ALJ rejected Dr. Brodsky's medical opinion partly on the basis of Plaintiff's ADLs, it is well established that the ALJ can discount a treating source's medical opinion outright only on the basis of contrary medical evidence. *Plummer v. Apfel*, 186 F.3d at 429. The ALJ's vague reference to "other treating and examining sources" fails to satisfy this standard based on the medical record before this Court. For these reasons, the Court finds that the ALJ failed to adequately explain his assessment of the medical evidence insofar as it relates to Dr. Brodsky's function capacity evaluation.

## 2. The Opinions of Dr. Last

Plaintiff also challenges the ALJ's treatment of the medical opinions rendered by Dr. Last. In particular, the ALJ discounted Dr. Last's opinions that Plaintiff suffers from moderate limitations in his ADLs (*see* R. 255), serious limitations with respect to concentration,

---

Emanuel Schnepp, Ph.D., did not opine on Plaintiff's physical limitations and, in any event, the ALJ did not refer to or discuss Dr. Schnepp's opinions in rendering his administrative ruling. Accordingly, this Court also does not rely on Dr. Schnepp's opinions. *See Fargnoli*, 247 F.3d at 44 n.7.

persistence, and pace (R. 279), and a GAF of 45 (R. 255).  In rejecting these opinions, the ALJ

provided the following explanation:

> [T]he Administrative Law Judge finds that the GAF is a subjective scale used to
> evaluate social, occupational or school functioning on a hypothetical continuum
> and is reflective of an individual's level of functioning only at that particular time.
> In addition, the GAF scale is based primarily on a clinician's judgment of an
> individual's overall level of functioning, and in order to account for day-to-day
> variability in functioning, the GAF rating for the "current period" is sometimes
> operationalized as the lowest level of functioning for the past week (See the
> American Psychiatric Association Diagnostic and Statistical Manual of Mental
> Disorders, 4th Edition).[4]  Moreover, these findings are not consistent with the
> claimant's course of medical treatment, and his wide range of daily activities, all
> of which have been discussed above in this decision.  Therefore, Dr. Last's
> opinion has been afforded only minimal weight.

(R. 24.)

Plaintiff contends that the ALJ's analysis was deficient in two respects.  First, he asserts

that the ALJ failed to consider Dr. Last's answers to medical interrogatories as set forth in

Exhibit 12F (R. 278-79).  Second, Plaintiff contends that the ALJ failed to identify specific,

---

[4] Plaintiff argues that the ALJ erred when he referred to the American Psychiatric Association Diagnostic Manual of
Mental Disorders, 4th Edition ("DSM-IV") in connection with his analysis of Dr. Last's treatment records.
Specifically, Plaintiff argues that the ALJ violated the Administration's Hearings, Appeals and Litigation Manual
("HALLEX"), which provides:

> The ALJ must not cite medical texts and medical publications as the authority for resolving any
> issue.  If it is necessary to refer to a medical text or medical publication, the ALJ must submit the
> material to the claimant or the representative for review and comment, and make the material part
> of the record.

(Pl.'s Br. Supp. Mot. Summ. Judg. [ECF No. 14] at 13 (quoting HALLEX I-2-8-25(D).)  As Plaintiff points out, the
ALJ referred to the DSM-IV but failed to make the cited material part of the administrative record.

To the extent the ALJ violated the cited provision of the HALLEX, the Court finds no basis for reversible
error because the Third Circuit Court of Appeals has held that provisions of the HALLEX are not binding on the
Administration or the reviewing district court.  *See Chaluisan v. Commissioner of Social Sec.*, 481 F. App'x 788,
791 (3d Cir. 2012) ("Internal social security manuals lack the force of law and do not bind the Social Security
Administration.") (*citing Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) (*per curiam*)); *Bordes v. Commissioner of
Social Sec.*, 235 F. App'x 853, 859 (3d Cir. 2007) (noting that cited provisions from the HALLEX did not aid the
claimant because "they lack the force of law and create no judicially enforceable rights") (citing Schweiker, supra at
789).  *Accord Moore v. Apfel*, 216 F.3d 864, 868 (9th Cir. 2000) ("HALLEX is strictly an internal guidance tool,
providing policy and other procedural guidelines to ALJs and other staff members.  As such, it does not ... carry the
force and effect of law.").

conflicting medical evidence from other treating or examining sources to challenge Dr. Last's opinions.

With respect to Plaintiff's first point, the Court does not agree that "Exhibit 12F and the opinions contained within the document were not considered at any point in the analysis by the ALJ." (Pl.'s Br. Supp. Mot. Summ. Judg. [14] at 8.) In acknowledging (but rejecting) Dr. Last's opinion that Plaintiff suffers from "serious limitations with respect to concentration, persistence, and pace" (R. 24), the ALJ appears to have been referencing Exhibit 12F. In that document, Dr. Last answered "yes" to various interrogatories inquiring whether Plaintiff would suffer from "serious limitations" in terms of understanding, remembering and carrying out simple instructions, making simple work related decisions, responding and interacting appropriately to supervision and co-workers, and dealing with changes in a routine work setting. (R. 279.) Nowhere else in the record does Dr. Last appear to assess "serious limitations" relative to Plaintiff's functional abilities. Thus, the ALJ did address at least one aspect of Exhibit 12F.

On the other hand, the ALJ did not acknowledge or discuss Dr. Last's additional opinion, set forth in Exhibit 12F, that Plaintiff would be unable to work five consecutive days during the course of a week due to his low frustration tolerance, decreased motivation, and impaired concentration. (R. 279.) The ALJ's failure to address that opinion impedes this Court's ability to conduct a meaningful review because the Court cannot tell whether the ALJ considered and rejected this evidence or simply ignored it. *Cotter v. Harris*, 642 F.2d at 705 ("In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.").

The Court also agrees with Plaintiff that the ALJ failed to identify specific, conflicting medical evidence from other treating or examining sources to challenge Dr. Last's opinions.

Although the ALJ gave detailed reasons for discounting Plaintiff's GAF score, his only explanation for rejecting Dr. Last's assessment of serious limitations with respect to Plaintiff's concentration, persistence, and pace is his conclusion that Dr. Last's findings were "not consistent with the claimant's course of medical treatment, and his wide range of daily activities, all of which have been discussed above in this decision." (R. 24.) While a claimant's course of treatment can be relevant medical evidence, in this case, the ALJ's only observations along those lines were that "the claimant has not required recurrent hospital confinement due to *her* condition and *her* treatment currently consists of counseling sessions," and "mental status evaluations by examining physicians have revealed no evidence of psychotic thinking/thought process." (R. 23.) The ALJ's erroneous reference to Plaintiff as a female raises the concern that these statements are part of a different opinion. Moreover, it was inaccurate for the ALJ to suggest that Plaintiff's current treatment regimen was limited to counseling sessions, because the record reveals that Plaintiff had been prescribed a variety of medications for his on-going complaints of depression, anxiety, and sleep disturbances. Indeed, as of October 27, 2011, Plaintiff was still taking Ativan for anxiety, and Dr. Last planned to try him on Cymbalta for his depression because Plaintiff had been unable to tolerate Tofranil. (R. 291.) Accordingly, the Court agrees with Plaintiff that the ALJ failed to adequately account for Dr. Last's medical opinions as set forth in his answers to the medical interrogatories.

B.

Plaintiff next argues that the ALJ erred in failing to address and analyze his documented limitation with respect to the use of his hands. In his residual functional capacity evaluation, Dr. Brodsky opined that Plaintiff could occasionally perform fingering activity and only rarely perform grasping and handling activities. (R. 254.) Plaintiff also testified to difficulty holding

onto objects with his right hand and experiencing carpal tunnel symptoms in his right wrist. (R. 42, 60-61.) Plaintiff objects that the ALJ did not address whether or not this condition is a severe impairment at step 2 of his analysis, nor did he discuss or evaluate this particular limitation anywhere else in his opinion. The Commissioner counters that this objection lacks merit because the ALJ is not required to address every impairment at step two of his analysis and because the record is devoid of evidence that Plaintiff has any functional limitation related to his hands. The Court concludes that both parties are partially correct.

At step two of the analysis, the ALJ must determine whether Plaintiff has an impairment that can be considered "severe" within the meaning of the Act. 20 C.F.R. §416.920(a)(4)(ii). An impairment is "severe" if it significantly limits an individual's physical or mental ability to perform basic work activities. *Id*. at §416.920(c).[5] As one federal court has observed, "Step Two of the Commissioner's five step sequential evaluation process 'is a threshold analysis that requires [the claimant] to show that he has *one* severe impairment.'" *Desano v. Astrue,* Civil Action No. 3:CV-07-1823, 2009 WL 890940 *5 (M.D. Pa. March 31, 2009) (quoting *Bradley v. Barnhart,* 178 F. App'x 87, 90 (7th Cir. 2006))(alteration and emphasis in the original). In this case, the ALJ did not specifically address whether Plaintiff's alleged limitations with regard to the use of his hands constituted a severe "impairment." However, the ALJ clearly found in favor of Plaintiff at Step Two inasmuch as the ALJ determined that Plaintiff suffered from other severe impairments. Consequently, even if the ALJ erred in failing to consider whether Plaintiff's alleged impairment in the use of his hands was severe, such error was harmless in the context of this case. *See Salles v. Commissioner of Social Security,* 229 F. App'x 140, 145 n. 2 (3d Cir. 2007) ("Because the ALJ found in Salles's favor at Step Two, even if he had erroneously

---

[5] Basic work activities include "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. § 404.1521(b).

concluded that some of her other impairments were non-severe, any error was harmless.") (citing *Rutherford v. Barnhart,* 399 F.3d 546, 553 (3d Cir. 2005)); *Desando, supra,* at *5 (ALJ's failure to address whether plaintiff's alleged fibromyalgia constituted a "severe impairment" was irrelevant and harmless where the ALJ had found that plaintiff suffered from other severe impairments sufficient to move beyond the second step of the evaluation process); *Bliss v. Astrue,* Civil Action No. 08-980, 2009 WL 413757 *1 n. 1 (W.D. Pa. Feb. 18, 2009) ("[A]s long as a claim is not denied at Step Two, it is not generally necessary for the ALJ to have specifically found any additional alleged impairments to be severe.").

On the other hand, even if the ALJ need not expressly consider every impairment in connection with his analysis at Step Two, he must still consider such impairments, and any related limitations, at subsequent steps of his analysis. *See* SSR 96-8p, 1996 WL 374184 *5 (July 2, 1996) ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"); *Lindsay v. Colvin,* 2014 WL 2804909 *16 (E.D. Pa. Feb. 28, 2014) ("[T]he RFC must consider all functional limitations, including mild limitations from impairments that the ALJ has previously determined to be non-severe."). *See also* Def.'s Br. Supp. Mot. Summ. Judg. [ECF No. 16] (acknowledging that, "[t]he step-two decision is a threshold analysis, and once the ALJ finds any one impairment severe, he may move on to consider all impairments, severe or not, at subsequent steps.").

For the reasons previously discussed, this Court agrees that the ALJ failed to adequately address Dr. Brodsky's opinion that Plaintiff is limited in his ability to perform fingering movements as well as grasping and handling. Because the ALJ failed to address this potential impairment in connection with his RFC determination, a remand of this case is warranted. *See*

*Fargnoli,* 247 F.3d at 41 ("[T]he ALJ's finding of residual functional capacity must 'be accompanied by a clear and satisfactory explication of the basis on which it rests.'").

The Commissioner insists that the ALJ implicitly rejected this aspect of Dr. Brodsky's medical assessment and that it was appropriate for the ALJ to do so because Dr. Brodsky's medical assessment was unsupported by the evidence in the administrative record. However, if the ALJ intended to discount Dr. Brodsky's medical opinion in this regard, it was incumbent upon the ALJ to indicate as much in his opinion and to provide some accompanying explanation. *Adorno,* 40 F.3d at 48 ("The Secretary must provide some explanation for a rejection of probative evidence which would suggest a contrary disposition."). In the absence of such an explanation, this Court cannot discern the ALJ's reasoning, and this Court is not at liberty to supply its own reasoning where the ALJ has provided none.

## C.

Plaintiff next argues that the ALJ's hypothetical question to the vocational expert was deficient because it failed to include impairments and limitations that were supported by the medical record. A hypothetical question posed to a vocational expert "must accurately convey to the vocational expert all of a claimant's credibly established limitations*." Rutherford,* 399 F.3d at 554. If the question does not reflect all of a claimant's impairments that are undisputed by the record, "the expert's response is not considered substantial evidence" of whether work exists in significant numbers in the national economy that could be performed by the claimant. *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir.2002).

In this case, the Court cannot say that the testimony of the vocational expert constituted substantial evidence in support of the ALJ's disability determination because of the ALJ's previously discussed errors with respect to his analysis of the opinions of Dr. Last and Dr.

Brodsky.  In essence, Plaintiff is challenging the administrative law judge's RFC determination, which was incorporated into his hypothetical question to the vocational expert.  The Third Circuit Court of Appeals has admonished that an "ALJ's explanation of his conclusion [relative to the claimant's residual functional capacity] must be as comprehensive and as analytical as possible and should include a statement of the facts in support so that [the reviewing court] may discharge [its] duty to determine whether the conclusion is supported by substantial evidence." *Yensick v. Barnhart,* 245 F. App'x 176, 181 (3d Cir. 2007) (*citing Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir.1981)).  "Without this explanation 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Id.* (quoting Burnett v. commissioner of Social Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000)).  "Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided." *Id.* (*quoting Fargnoli*, 247 F.3d at 42).

Here, the ALJ failed to account for probative evidence in the record which conflicted with his assessment of the Plaintiff's residual functional capacity.  The functional limitations which the ALJ failed to adequately address would, if credited, either patently or potentially preclude Plaintiff from performing the jobs identified by the vocational expert.  Accordingly, the Court will remand this case so that the administrative law judge can provide a more comprehensive analysis of the relevant medical evidence as it bears on the alleged limitations identified in this opinion.

## VI. Conclusion

Based upon the foregoing, the Court finds that the Plaintiff's motion for summary judgment must be denied to the extent it seeks the reversal of the Commissioner's decision and

an award of benefits in her favor. However, Plaintiff's Motion for Summary Judgment will be granted to the extent it seeks a remand of this matter back to the ALJ for further explanation as more specifically outlined in the Opinion, above. Accordingly, Plaintiff's Motion for Summary Judgment (ECF No. 13) will be granted in part to allow for a remand to the ALJ, and denied in part with respect to the request for an award of benefits; Defendant's Motion for Summary Judgment (ECF No. 15) will be denied; and the decision of the ALJ will be vacated and remanded for further proceedings consistent with this Memorandum Opinion.

An appropriate Order follows.

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc: All Registered ECF Counsel and Parties